# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO
_____

LINDA MARTINEZ,

      Plaintiff,

v.                                No. CIV 00-1784 WJ/WWD

ELIAS GONZALES, et al.,

      Defendants.

## MEMORANDUM OPINION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court pursuant to Defendants' Motion for Summary Judgment, or in the Alternative, for Qualified Immunity [Docket No. 43]. For the reasons and in the manner stated below, this motion is denied in part and granted in part.

## STATEMENT OF FACTS[1]

Plaintiff was the Village Clerk-Administrator for the Village of Cimarron, New Mexico and worked for the Village of Cimarron for twenty-two years. In March 1998, Elias Gonzales was elected Mayor of Cimarron. At the time of Mr. Gonzales' election, he was serving on the Village Council. Thus, when he took the position of Mayor, a vacancy was created on the Council. Gonzales recommended that Defendant Mike Hammitt be appointed to the vacancy and the Council approved this appointment.

_____

[1]The statement of facts includes both undisputed facts and disputed facts with the factual inferences drawn in favor of Plaintiff where evidence has been provided to support those inferences.

Sometime after Gonzales was elected, a full-time job vacancy occurred with the Village. Among the applicants was a current employee of the Village and Gonzales' wife's niece. Gonzales' wife's niece was hired to fill the vacancy.

At a July 2, 1998 Village Council meeting, Plaintiff told the Council that she believed the hiring decision and selection process was unfair. She stated that the current Village employee who had applied for the position should have been given the job rather than Gonzales' wife's niece because the current employee had already been doing the work. Plaintiff avers that she also expressed concern that the person hired was a relative of Gonzales, that this person was less experienced than the in-house applicant and that there might be liability issues for nepotism.

Shortly after the July 2, 1998 Council meeting, Gonzales displayed anger toward Plaintiff at a staff meeting. Gonzales told Plaintiff that he was sorry he had broken up her little family. Additionally, Gonzales accused Plaintiff of stealing tornado relief funds. Gonzales began yelling at Plaintiff on a weekly basis. Plaintiff's deposition testimony indicates that Gonzales also began reducing Plaintiff's job responsibilities.

Sometime in late 1998 and early 1999, Plaintiff discovered what she believed were improper expenditures by Gonzales. Plaintiff expressed her concerns to the Village Attorney, one of the Village Council members who was also Mayor Pro Tem and the New Mexico Department of Finance. She also contacted the State Auditor. The Village hired an independent auditor. At the conclusion of the audit, the independent auditor referred the audit results to the State Auditor who investigated and referred the matter to the District Attorney who in turn, initiated a criminal investigation.

From the time Plaintiff expressed concern about expenditures through the time of the initial criminal investigation, Plaintiff's evidence supports an inference that Gonzales yelled at Plaintiff

several times. For instance, at a Council meeting, one Council member raised the issue of whether proper accounting occurred for items that were purchased by the Village. Gonzales later yelled at Plaintiff for allowing the Council member to raise the issue. At another Council meeting Plaintiff expressed her concerns about cell phone use and the use of purchase orders. Gonzales yelled at her for raising the issues before the Council.

Plaintiff's evidence also supports an inference that during the Village independent audit, Gonzales yelled at Plaintiff several times and demanded that she disclose the results of the audit. Additionally, after Gonzales was interviewed by Officer Jakoby of the New Mexico State Police pursuant to the criminal investigation, Gonzales began calling Plaintiff at home and yelling at her. Plaintiff avers that, during this time while Gonzales was still acting as Mayor, Council member Hammitt also came to her office and demanded to see the evidence against the Mayor. According to Plaintiff, Hammitt yelled at her to prove that Gonzales had misused Village funds.

Gonzales was arrested in April 2000 on charges related to the investigation. As a condition of his release, Gonzales was prohibited from going to City Hall. Defendant Hammitt began acting as Mayor Pro Tem, so he took over many of the mayoral responsibilities during Gonzales' absence. After Hammitt had taken over these responsibilities, he again asked Plaintiff to provide him with information and documentation on the charges contained in the audit. Plaintiff told him that he would have to get that information from the auditor. Plaintiff attests that Hammitt told her she should have taken the issue of the expenditures to the Village Council rather than report it.

On April 25, 2000, four council members including Hammitt pre-approved several bills for payment at Plaintiff's office. At an April 26, 2000 council meeting, the full council formally approved the bills for payment. At that same meeting, Plaintiff read a letter to the council stating that she

believed she was being slandered for having turned Gonzales in to the State Auditor and that Hammitt was one of the persons slandering her. The next day, Gonzales and Hammitt issued Plaintiff a written reprimand for not properly processing bills for payment in spite of the fact that the full council has approved the bills for payment.

Hammitt held a personnel meeting in May 2000. At the meeting, Plaintiff asked Hammitt if he believed the "fix" that Gonzales was in was her fault. Hammitt stated that he believed some of it was her fault and some of it could have been prevented and handled in a better way if there had been a two-signature check system in place. Hammitt also said the council should have been informed up front. A transcript of a tape of the meeting indicates a lengthy exchange between Hammitt and Plaintiff in which Plaintiff expressed her lack of trust in Hammitt, said he had misled her in the past, spoke of having taken a lot of abuse over the past two years and stated she would not take any more abuse. She also asked that if she were going to be fired, then she wanted to be fired right away and not play games. Plaintiff avers that she was not rude to Hammitt and did not call him a liar at the meeting.

Hammitt sent Plaintiff a letter on July 6, 2000 notifying her that a Special Meeting of the Governing Body would occur on July 12, 2000 to discuss Plaintiff's behavior at the May 2000 personnel meeting, her responsibilities as procurement officer, her responsibilities as personnel officer, and any other aspect of Plaintiff's job that any Council member wished to discuss. The letter also notified Plaintiff that the Village attorney would be present at the meeting and Plaintiff was advised to bring legal counsel.

Plaintiff submitted her letter of resignation on July 7, 2000. Plaintiff resigned because she believed she was going to be fired. She felt she had no choice but to resign to leave her with some semblance of dignity.

Plaintiff makes allegations that Defendants Hammitt and Gonzales retaliated against her by making defamatory remarks about her to people in the community and having their family members make defamatory remarks about her. Plaintiff's only competent evidence that either Hammitt or Gonzales made any statements that might be defamatory is a newspaper article quoting Hammitt as saying that Plaintiff was not using proper procedures for paying bills. The evidence Plaintiff provides that family members of Gonzales and Hammitt made defamatory remarks do not show any direct involvement by the Defendants.

During the last two years of employment, Plaintiff sought medical and psychological treatment for stress related illnesses and anxiety. In November 1999, Plaintiff twice saw a doctor about her stress and took time off from work. By May 2000, Plaintiff was attending counseling. Plaintiff's doctor excused her from work from May 1 through May 19, 2000 because of acute anxiety. When Plaintiff resigned, she felt she could not give two weeks notice because of the risk to her mental health.

Plaintiff's Complaint alleges that Defendants retaliated against her for her protected speech in violation of the First and Fourteenth Amendments to the United States Constitution. She alleges that the individual Defendants harassed her, that the harassment was intentional, willful, malicious, and in deliberate disregard of Plaintiff's rights, and that the retaliatory acts of the individual Defendants constituted a policy of the Village of Cimarron rendering the Village liable for these acts. Defendants' Motion for Summary Judgment argues that Plaintiff suffered no adverse employment

action and that Plaintiff was not constructively discharged. Additionally, they urge that the individual Defendants are entitled to qualified immunity because, at the time of the incidents alleged by Plaintiff, there was no clearly established law that the acts of Defendants amounted to adverse employment action. Finally, Defendants assert that the Village is not liable for the acts of the individual Defendants because neither of them was a final decisionmaker for the Village, and no pattern or practice has been established.

**LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Worrell v. Henry, 219 F.3d 1197, 1204 (10th Cir. 2000). In ruling on a motion for summary judgment, a court does not weigh the evidence, but determines whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Jeffries v. State of Kansas, 147 F.3d 1220, 1228 (10th Cir. 1998). In making this determination, the Court must construe all the facts in the record and reasonable inferences that can be drawn from those facts in a light most favorable to the nonmoving party. Worrell, 219 F.3d at 1204; Jeffries, 147 F.3d at 1228.

**DISCUSSION**

I.      RETALIATION FOR PROTECTED SPEECH

A public employer cannot retaliate against an employee for exercising her constitutionally protected right of free speech. Finn v. New Mexico, 249 F.3d 1241, 1246 (10th Cir. 2001). A First Amendment retaliation claim is evaluated using a well-established four part inquiry in which (1) the Court determines whether the Plaintiff's speech involves a matter of public concern; and, if so (2) the

Court balances the Plaintiff's interest in commenting on matters of public concern against the interests of the Defendants, as employers, in promoting the efficiency of the public services it performs through its employees; then, if the balance tips in favor of the Plaintiff (3) the Plaintiff must show that the speech was a substantial or motivating factor in a detrimental employment decision; then, if the Plaintiff establishes that the speech was a factor, (4) the Defendants may demonstrate that they would have taken the same action with regard to Plaintiff even in the absence of the protected speech. Finn, 249 F.3d at 1246; Lybrook v. Farmington Municipal Schools Bd. of Educ., 232 F.3d 1334 (10th Cir. 2000).

Defendants seemingly make the Court's task easier by conceding, for purposes of their motion, that Plaintiff's speech involved a matter of public concern, and that Plaintiff's interest in commenting on the matter outweighs the Defendants' interests. However, Defendants concession is tempered by the manner in which they characterized their statement of undisputed material facts. Defendants characterized their facts in such a way to state that, of all the speech engaged in by Plaintiff, the only protected speech involved Plaintiff's concerns about improper expenditures expressed from the time she spoke with the Village attorney and the State Auditor. In other words, Defendants put forward, without offering any legal argument, that Plaintiff's comments at a council meeting in July 1998 regarding a hiring decision and process did not amount to protected speech.

A government employee's speech is of public concern if it is of interest to the community, whether for social, political, or other reasons. Jantzen v. Hawkins, 188 F.3d 1247, 1257 (10th Cir. 1999). Matters solely of personal interest to government employees, however, are not protected by the First Amendment. Dill v. City of Edmond, Oklahoma, 155 F.3d 1193, 1202 (10th Cir. 1998). Speech related to internal personnel disputes ordinarily does not involve matters of public concern.

Id.  However, speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials clearly involves matters of public concern.  Id.

Defendants' statement of undisputed material facts asserts that Plaintiff's expressed concerns regarding the hiring process and a hiring decision were based on Plaintiff having lost some of her own authority in the hiring process and Plaintiff's perception that the person hired was not as qualified as an in-house applicant.  Plaintiff's affidavit, however, states that, in addition to stating her opinion that the in-house applicant was better qualified, her comments to the Council members included her concerns regarding nepotism and possible Village liability.

Plaintiff's comments to the council regarding her opinion that the in-house applicant was more qualified for a job vacancy than the person hired is not speech on a matter of public concern.  This is speech regarding internal personnel matters solely of interest to government employees.  However, there is a disputed issue of material fact regarding the entire contents of Plaintiff's speech at the July 1998 council meeting.  A reasonable jury could find that Plaintiff commented on concerns regarding nepotism and Village liability.  These comments, if made, are on matters of public concern as they express concern regarding possible impropriety on the part of government officials.

If Plaintiff's comments at the July 1998 council meeting include concerns regarding nepotism and Village liability, her interests in commenting on these matters outweigh any countervailing interests the Defendants might have in regulating the speech to maintain an effective working environment.  A government may not restrict the protected speech of an employee unless the government shows that an actual disruption of services will result from the speech.  Dill, 155 F.3d at 1203.  The government cannot rely on speculative allegations that certain statements will cause disruption.  Id.  Defendants have not offered any argument or support for a finding that Plaintiff's

comments could be restricted.  Nor can the Court draw such an inference from the facts when viewed in a light most favorable to Plaintiff.  Thus, drawing all factual inferences in a light most favorable to Plaintiff,  her speech at the July 1998 council meeting is protected speech under the First Amendment.

The first two prongs having been dealt with by Defendants' concession and the Court's analysis, the Court now addresses the third prong of the First Amendment retaliation claim inquiry.  Normally, this prong, whether the speech was a substantial or motivating factor in the challenged employment decision, presents issues of fact for a jury.  Dill, 155 F.3d at 1202.  However, Defendants assert that, even if the speech motivated the actions of Defendants, none of the actions by Defendants are detrimental employment decisions sufficient to meet the requirements of the third prong, and Plaintiff was not constructively discharged.

A.    Did Defendants Take Adverse Employment Action With Regard to Plaintiff?

The Tenth Circuit liberally defines the phrase "adverse employment action"  Sanchez v. Denver Public Schools, 164 F.3d 527, 532 (10th Cir. 1998) and takes a case-by-case approach in determining whether a given employment action is adverse.  Gunnell v. Utah Valley State College, 152 F.3d 1253, 1264 (10th Cir. 1998).  There are deprivations less harsh than dismissal that will be considered adverse or detrimental employment actions in violation of an employee's First Amendment rights.  Lybrook, 232 F.3d at 1340.  A government employer's conduct in retaliation against an employee's exercise of protected speech may be actionable when it involves removing job duties, giving written reprimands and giving lower scores on performance evaluations.  Schuler v. City of Boulder, 189 F.3d 1304, 1310 (10th Cir. 1999).  Additionally, hostility and harassment, if sufficiently severe, may be adverse employment action for purposes of a retaliation claim.  Gunnell, 152 F.3d at 1264.  While unrealized threats often do not rise to the level of adverse employment actions, a threat

of discharge from someone with considerable influence over the decision to discharge may be an adverse employment action. Jeffries, 147 F.3d at 1232.

Not all acts, however, are sufficient to support a retaliation claim. Lybrook, 232 F.3d at 1340. Mere inconveniences are not considered adverse employment actions. Sanchez, 164 F.3d at 532. Nor are tense personal relationships. Jeffries, 147 F.3d at 1232. Oral reprimands and unnecessary derogatory comments have been found to not fall within the definition of adverse employment action unless there is evidence that the actions had some impact on the employee's employment status. Sanchez, 164 F.3d at 533. Ultimately, action is adverse employment action if it constitutes a significant change in employment status such as, but not limited to, hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. Id. at 532. The guiding principal in the Court's case-by-case analysis is that an adverse employment action is one that alters the employee's compensation, terms, conditions, or privileges of employment, or adversely affects her status as an employee. Heno v. Spring/United Mgmt. Co., 208 F.3d 847, 857 (10th Cir. 2000).

In this case, Plaintiff alleges that a pattern of harassment by the individual Defendants was so severe as to constitute adverse employment action. Plaintiff avers that Defendant Gonzales accused her of stealing tornado relief funds, yelled at her on a weekly basis, and began reducing her job responsibilities after she expressed concerns regarding nepotism at a council meeting. Gonzales' yelling at Plaintiff is not an adverse employment action. The evidence does not support a finding that the yelling was sufficiently severe to have an impact on Plaintiff's status as an employee. However, Gonzales' accusation that Plaintiff stole funds and the reduction of Plaintiff's job responsibilities, if

these actions are found to have occurred, are sufficiently onerous to have altered Plaintiff's conditions of employment and meet the Tenth Circuit's definition of adverse employment action.

Plaintiff also avers that Defendant Gonzales began yelling at her for expressing her concerns regarding Village expenditures. She also states that he demanded to see the audit results and began calling her at home and yelling at her after he was interviewed by a detective regarding Village expenditures. Gonzales' requests to see the audit results and his yelling at Plaintiff during normal working hours do not rise to the level of adverse employment actions. Again, these actions are not sufficiently severe to have changed Plaintiff's conditions of employment or employment status. See Amro v. Boeing Co., 232 F.3d 790 (10th Cir. 2000). Under the circumstances of this case, however, the actions of Gonzales calling Plaintiff at home and yelling at her does rise to the level of an adverse employment action. These actions by Gonzales changed the times at which Plaintiff could expect to be called upon to answer for her actions at work and they changed the number of hours during the week Plaintiff could expect to be called upon to answer for her work responsibilities. Thus, Gonzales' calls to Plaintiff's home, if they occurred, are adverse employment actions sufficient to support Plaintiff's claim.

Plaintiff attests that Defendant Hammitt demanded evidence Plaintiff might have against the mayor and yelled at her to prove that Gonzales did anything wrong. Plaintiff's evidence also supports an inference that Hammitt and Gonzales gave Plaintiff a reprimand in response to Plaintiff informing the council that she believed she was being harassed for having engaged in protected speech. Plaintiff further asserts that Hammitt engaged in harassment amounting to adverse employment action in the May 2000 personnel meeting. Even viewing the evidence in a light most favorable to Plaintiff, Hammitt's yelling at Plaintiff and demanding any proof or evidence that Gonzales did anything wrong

do not rise to the level of adverse employment action. This conduct did not alter Plaintiff's employment conditions or status as an employee. Similarly, Plaintiff's assertions that Hammitt engaged in harassment amounting to adverse employment action in the personnel meeting in May 2000 are without evidentiary support. Plaintiff states, and the transcript of the meeting shows, that Hammitt responded to Plaintiff's questions on his opinions regarding the situation with Gonzales. He did state that he believed the situation with Gonzales was in part Plaintiff's fault and that he believed Plaintiff should have initially taken her concerns to the council. These expressions are no form of harassment and do not constitute adverse employment action. On the other hand, the reprimand is adverse employment action sufficient to support Plaintiff's claim.

Plaintiff and Defendants present the same evidence that Hammitt sent Plaintiff a letter notifying her of a council meeting to which she should bring legal counsel. The letter states that the purpose of the council meeting is to address various concerns regarding Plaintiff's job responsibilities and her behavior at the May 2000 personnel meeting. The letter has the appearance of a threat of discharge or other adverse employment action. While the threat was unrealized because Plaintiff resigned before the council meeting could take place, the letter was from someone with considerable influence over a decision to discharge or take adverse employment action. Thus, if written in response to Plaintiff's protected speech, it is adverse employment action.

Plaintiff states that the letter and council meeting were intended to retaliate against her for protected speech. Defendants argue that the letter was intended to address legitimate concerns, and that the meeting cannot be adverse employment action because it never occurred and guessing at the outcome of the meeting would be speculation.

The letter could be read by a reasonable fact-finder as a response to Plaintiff's protected speech. Alternatively, the letter could be read as arising from legitimate concerns regarding Plaintiff's conduct at the May 2000 personnel meeting as transcribed from Plaintiff's own audio tape. Drawing all factual inferences in Plaintiff's favor as this Court must do on a motion for summary judgment, I must assume that Plaintiff's protected speech was a substantial or motivating factor for the letter. Thus, it will support Plaintiff's claim. Conversely, and as Defendants have pointed out, the council meeting itself never occurred and cannot be adverse employment action.

Finally, Plaintiff alleges that Defendants Hammitt and Gonzales retaliated against her by making defamatory remarks about her to people in the community and having family members make defamatory remarks about her. As noted above, the only competent evidence regarding any statements made by Hammitt or Gonzales concerns a statement by Hammitt to a newspaper reporter. This conduct is not adverse employment action. It did not alter Plaintiff's conditions of employment or affect her status as an employee. Other circuit courts that have addressed the issue of whether defamatory remarks by a supervisor can be adverse employment action have found that they are not. See McLaughlin v. Watson, 271 F.3d 566, 573 (3rd Cir. 2001) ("The nature of the defendant's retaliatory acts has particular significance where the public official's acts are in the form of speech. . . . [A] public official's own First Amendment speech rights are implicated. Thus, where a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or intimidation, . . . such speech does not adversely affect a citizen's First Amendment rights even if defamatory.") (citing Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 687 (4th Cir. 2000)). The Court need not decide whether the other alleged defamatory conduct of Gonzales and Hammitt rises to the level of adverse employment action because Plaintiff has failed to come forward with sufficient

competent evidence to show a factual dispute regarding these incidents. Therefore, Defendants are entitled to summary judgment with regard to these allegations.

Defendants argue that, even viewing the evidence in a light most favorable to Plaintiff, they took no action with regard to Plaintiff that falls within the definition of adverse employment action. This Court finds otherwise. Specifically, I find that if Gonzales accused Plaintiff of stealing tornado relief funds, reduced Plaintiff's job responsibilities, called Plaintiff at home and yelled at her, and reprimanded her, these would constitute adverse employment actions. Similarly, if Hammitt reprimanded her, this was adverse employment action as was the July 2000 letter sent by Hammitt to Plaintiff.

      B.    <u>Was Plaintiff Constructively Discharged?</u>

An employee who is not formally discharged may still have been constructively discharged if the employee was forced to quit due to intolerable working conditions. <u>Bolden v. PRC Inc.</u>, 43 F.3d 545, 552 (10th Cir. 1994). In determining whether a plaintiff voluntarily resigned or was constructively discharged, the Court must consider the totality of the circumstances under an objective standard. <u>Yearous v. Niobrara County Mem'l Hosp.</u>, 128 F.3d 1351, 1356 (10th Cir. 1997). "Constructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." <u>Sanchez</u>, 164 F.3d at 534. "If an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged." <u>Jeffries</u>, 147 F.3d at 1233; <u>Parker v. Bd. of Regents of Tulsa Junior College</u>, 981 F.2d 1159 (10th Cir. 1992). "Essentially, a plaintiff must show that she had no other choice but to quit." <u>Sanchez</u>, 164 F.3d at 534. The standard for constructive discharge is objective. Therefore, the issue

is whether a reasonable person in Plaintiff's position would have viewed the working conditions as intolerable. Jeffries, 147 F.3d at 1233; Derr v. Gulf Oil Corporation, 796 F.2d 340, 343 (10th Cir. 1986). The Plaintiff's subjective views of the working conditions are irrelevant. Sanchez, 164 F.3d at 534.

Plaintiff was not constructively discharged. She resigned of her own free will. Plaintiff's evidence does not support a finding that a reasonable person in Plaintiff's position would have had no choice but to quit. No inference can be drawn from the evidence that Plaintiff's working conditions were so objectively intolerable that her resignation was not the result of the exercise of free will. Therefore, Defendants are entitled to summary judgment on the issue of constructive discharge.


II.     QUALIFIED IMMUNITY

The defense of qualified immunity is designed to shield public officials from erroneous suits as well as liability and protects all but the plainly incompetent or those who knowingly violate the law. Holland v Harrington, 268 F.3d 1179, 1185 (10th Cir. 2001); Hinton v City of Elwood, Kansas, 997 F.2d 774, 779 (10th Cir. 1993). For this reason, special standards apply to a summary judgment motion raising the defense of qualified immunity. Hinton, 997 F.2d at 779. When a defendant asserts a qualified immunity defense, Plaintiff bears the initial burden of making two showings. Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001); Holland, 268 F.3d at 1185. First, a plaintiff must show that a defendant's alleged actions violated a constitutional or statutory right. Medina, 252 F.3d at 1128. The Court, in determining whether this showing is made, must assess whether the facts, taken in the light most favorable to the plaintiff, show that the defendant's conduct violated a constitutional or statutory right. Holland, 268 F.3d at 1185.

If a favorable view of the facts shows the violation of a constitutional or statutory right, Plaintiff must then show that the right was clearly established at the time the allegedly wrongful conduct occurred. Id. at 1186. The contours of the right must have been sufficiently clear at the time such that a reasonable official would have understood that his or her conduct was unlawful. Id. A constitutional right is clearly established for qualified immunity purposes when there is a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts has found the law to be as the plaintiff maintains. Camfield v City of Oklahoma City, 248 F.3d 1214, 1228 (10th Cir. 2001). Plaintiff need not show that the very action in question was previously held unlawful. Schuler, 189 F.3d at 1309. While there must be some similarities between cited cases and the factual situation in the case at hand, the similarities need not be identical. Id.

The Court has already determined that Plaintiff's speech involved matters of public concern and that the Pickering balancing test tips in her favor. The Court has also already found that Defendant Gonzales did not violate Plaintiff's constitutional rights when he yelled at her during working hours because this conduct was not an adverse employment action. Nor did Defendant Hammitt violate Plaintiff's constitutional rights when he yelled at Plaintiff, when he demanded audit results or any evidence she had against Gonzales, or when he told a newspaper reporter that Plaintiff had not used proper procurement procedures when paying bills. However, even if this conduct had violated Plaintiff's constitutional rights, the Court finds that the law was not clearly established at the time that these acts would violate Plaintiff's rights. Therefore, Defendants are entitled to qualified immunity for these actions.

The Court has already found, as specified above, that various actions of Defendants Hammitt and Gonzales are adverse employment actions, and, viewing the facts in a light most favorable to

Plaintiff, there is an inference that Plaintiff's speech was a substantial or motivating factor in the Defendants having taken these actions. Thus, with regard to this conduct, Plaintiff has met her burden of making the first showing in response to Defendants' qualified immunity defense. See Dill, 155 F.3d at 1204. The Court may move forward to address whether Plaintiff has shown that Defendants' conduct violated a clearly established right.

Defendants argue that the case-by-case approach taken by the Tenth Circuit in evaluating whether particular conduct constitutes adverse action suggests that the standards are not clearly established. The Tenth Circuit has recognized that case-by-case analysis does make it less likely that the law will be clearly established. Dill, 155 F.3d at 1204; Patrick v. Miller, 953 F.2d 1240, 1246 (10th Cir. 1992). However, the case-by-case approach does not automatically entitle Defendants to qualified immunity. Patrick, 953 F.2d at 1246. "In order to be clearly established, the exact conduct in question does not have to have been previously declared unlawful; however, in light of pre-existing law the unlawfulness must be apparent." Dill, 155 F.3d at 1204-1205.

At the time of Defendants' alleged conduct, it was clearly established in the Tenth Circuit that retaliation against an employee for the exercise of her First Amendment rights is a violation of 42 U.S.C. Section 1983. Barrett v. Harrington, 130 F.3d 246, 264 (10th Cir. 1997). Additionally, it has long been clearly established that deprivations less harsh than dismissal may violate an employee's rights under the First Amendment. Wren v. Spurlock, 798 F.2d 1313, 1318 (10th Cir. 1986). However, there is no clearly established Supreme Court, Tenth Circuit, or weight of authority from other circuits showing that Gonzales' conduct in calling Plaintiff at home and yelling at her would violate her rights. Thus, with regard to this conduct, Gonzales is entitled to qualified immunity

because the law was not clearly established such that a reasonable official would know that such conduct would violate an employee's rights.

Similarly, there was no Supreme Court precedent, Tenth Circuit precedent, or weight of authority from other circuits at the time of Defendants' alleged conduct that would put Gonzales on notice that accusing Plaintiff of criminal conduct, without more, would violate Plaintiff's rights. In Berry v. Stevinson Chevrolet, 74 F.3d 980 (10th Cir. 1996), the Tenth Circuit did establish that the filing of criminal charges could be adverse employment action. However, there is no case law brought to the attention of the Court finding that an accusation, albeit a potentially defamatory one, is or may be an adverse employment action. Thus, Defendant Gonzales is entitled to summary judgment on the issue of this particular conduct.

There is currently clearly established Tenth Circuit law that removing an employee's job responsibilities can be adverse employment action. Schuler, 189 F.3d at 1310. However, this was not clearly established law at the time Plaintiff's job duties were being removed. The Schuler decision is dated September 7, 1999. Plaintiff alleges that Defendant Gonzales began removing her job responsibilities shortly after July 1998. Thus, Schuler does not help Plaintiff in responding to Defendants' qualified immunity defense, and Gonzales is entitled to qualified immunity with regard to his conduct in removing Plaintiff's job responsibilities.

There was Tenth Circuit precedent at the time of the Defendants' alleged conduct that reprimanding an employee and threatening an employee with discharge or other adverse employment action would violate an employee's rights. In Schuler, the Tenth Circuit found that an employer had retaliated against an employee by giving the employee a written reprimand. 189 F.3d at 1310. Plaintiff's evidence suggests she was reprimanded on April 27, 2000, several months after the Schuler

decision. Thus, the law was clearly established at the time of Defendants' conduct such that reasonable persons in Hammitt's and Gonzales' positions should have known that their conduct amounted to a violation of Plaintiff's rights.

There was also Tenth Circuit precedent at the time Defendant Hammitt sent Plaintiff the July 2000 letter that an unrealized threat of discharge or other adverse employment action can rise to the level of adverse employment action when the threat comes from someone in a position with significant influence over decisions to discharge or take adverse employment action. In <u>Jeffries</u>, the Court found that a threat to not renew an employee's contract and to not provide supervision to the employee was sufficient to show adverse employment action when the threat came from a person who had considerable influence over employment and work assignment decisions. 147 F.3d at 1232. The <u>Jeffries</u> decision in June 1998 predated Hammitt's letter by more than two years. Thus it was clearly established at the time Hammitt sent the letter such that Hammitt should have known the conduct would violate Plaintiff's rights.

In summary, both Hammitt and Gonzales are entitled to qualified immunity for their conduct in yelling at Plaintiff during work hours and demanding to see audit reports and other evidence because these actions did not violate Plaintiff's rights, and, even if they did violate her rights, the law was not clearly established at the time such that Defendants should have known this conduct violated Plaintiff's rights. Defendant Gonzales is entitled to qualified immunity for his conduct in calling Plaintiff at home and yelling at her; while this conduct violated her rights, the law was not clearly established at the time such that Gonzales should have known such conduct would violate Plaintiff's rights. Similarly, Gonzales is entitled to qualified immunity for removing Plaintiff's job responsibilities because the law was not clearly established at the time that such conduct amounted

19

to a violation of an employee's rights. Neither Hammitt nor Gonzales are qualifiedly immune for

giving Plaintiff a reprimand, and Hammitt is not qualifiedly immune for his conduct in sending Plaintiff

the July 2000 letter; the law was clearly established at the time of these events that such conduct

could violate the rights of an employee.

III.    MUNICIPAL LIABILITY

A municipality cannot be held liable under 42 U.S.C. Section 1983 for the actions of its

employees under the theory of respondeat superior.  See Monell v. Department of Social Services,

436 U.S. 658, 691 (1978).  Instead, it must be shown that the unconstitutional actions of an employee

were representative of an official policy or custom of the municipal institution, or were carried out

by an official with final policy making authority with respect to the challenged actions.  See Pembaur

v. City of Cincinnati, 475 U.S. 469, 480-83 (1986) (plurality opinion); Seamons v. Snow, 206 F.3d

1021, 1029 (10th Cir. 2000); Randle v. City of Aurora, 69 F.3d 441, 446-50 (10th Cir. 1995).

A.    Were the Actions of Gonzales and Hammitt Representative of a Municipal Policy or
       Custom?

A municipal policy must be a policy statement, ordinance, regulation, or decision officially

adopted and promulgated by a municipality's officers.  See Lankford v. City of Hobart, 73 F.3d 283,

286 (10th Cir. 1996).  Absent such an official policy, a municipality may also be held liable if the

discriminatory practice is "so permanent and well settled as to constitute a custom or usage with the

force of law."  Id.  The discriminatory actions must be continuing, persistent and widespread.  Gates

v. Unified School District, 996 F.2d 1035 (10th Cir. 1993).  Additionally, Plaintiff must show that

the policymaking body had notice of the actions and exhibited deliberate indifference or tacitly

authorized the actions.  Id.

20

Plaintiff asserts that there was a custom or policy among Village council members to retaliate against Village employees who spoke out against the Mayor. In support of this theory of municipal liability, Plaintiff states that a majority of the council members had intimate connections to either Gonzales or Hammitt. Even if this is true, this does not support a finding that the council itself, as a governing body, was aware of the actions of Gonzales and Hammitt of which Plaintiff complains, or that the governing body itself tacitly authorized these actions or was deliberately indifferent to Plaintiff's rights. Plaintiff has failed to show that Gonzales' and Hammitt's actions are representative of a municipal policy or custom.

B.     Were Gonzales an Hammitt Final Policymakers With Respect to their Actions?

If the decision to adopt a particular course of action is "properly made by the government's authorized decisionmakers, it surely represents an act of official government policy as that term is commonly understood." Pembaur, 475 U.S. at 480-81. However, the fact that a particular official, even a policymaking official, has discretion in the exercise of particular functions does not, without more, give rise to municipal liability. See Oklahoma City v. Tuttle, 471 U.S. 808, 822-24 (1985). The official must also be responsible for establishing policy with regard to such activity before the municipality can be held liable. Pembaur, 475 U.S. at 483. An official exercising discretionary authority is not the final policymaker with regard to his actions when the policymaking body has authority to review the official's decisions. See Jantz v. Muci, 976 F.2d 623, 631 (10th Cir. 1992); Ware v. Unified School Dist., 902 F.2d 815, 819 (10th Cir. 1990); Wulf v. City of Wichita, 883 F.2d 842 (10th Cir. 1989). A policymaking body's failure to investigate the basis of an official's decision does not amount to delegation of policymaking authority. Ware, 902 F.2d at 818. If a policymaking body retains the authority to review the decisions of an official, the official has not been delegated

final policymaking authority even if the policymaking body does not exercise its right to review.  Id. Additionally, a municipality is not liable for the actions of an official just because it is aware of the official's decision and goes along with it.  Id.

Defendants offer Sections 3-12-1 through 3-12-4 of the New Mexico Statutes Annotated to show that the governing body of a municipality has the power to act as a body, but that no power is given to individual members of the governing body.  However, these statutes give broad authority to the governing body to define the powers and duties of its officers.  N.M. Stat. Ann. § 3-12-3(A)(9).  Therefore, state law does not preclude the governing body from delegating final policymaking authority to a municipal employee.  Plaintiff argues that both Gonzales and Hammitt had final policymaking authority with respect to their actions.  She first points out that both were council members.  Plaintiff also offers the deposition testimony of both Hammitt and Gonzales that the mayor has supervisory authority over Village employees while the Village council does not, that the mayor does the Clerk Administrator's performance evaluation, and that the mayor has the authority to fire the Clerk Administrator.[2]  However, Plaintiff's evidence, in the form of her own affidavit, states that the Village council approved terminations of Village employees after the fact. Additionally, Plaintiff's argument asserts that the council "rubber stamped" the decisions of the mayor.

In Ware, the Tenth Circuit found that a municipality was not liable for a school principal's actions in firing an employee.  902 F.2d at 819.  While the principal had authority to fire the plaintiff,

---

[2]Whether an official has final policymaking authority is a question of state law.  Pembaur, 475 U.S. at 483.  Normally, the Court would expect evidence on the municipal chain of authority to be in the form of whatever state law governs the chain of authority for the municipality. However, because it does not affect the decision of this Court, the Court will assume the law to be as the deposition testimony characterizes it.

he did not have final policymaking authority on personnel matters.  Id.  Additionally, his decisions were reviewable by the school board.  Id.  By contrast, in <u>Flanagan v. Munger</u>, the Tenth Circuit found that a municipality could be held liable for the acts of an official where the municipal code gave direct authority to the official, and there was no established procedure by which the official's decisions were reviewed.  890 F.2d 1557 (10th Cir. 1990).

The fact that the individual acting as mayor, whether it was Gonzales or Hammitt, had the authority to supervise Plaintiff and even terminate her employment does not make this person the final policymaker with regard to their actions while supervising Plaintiff.  Plaintiff's own evidence shows that the Village council retained the authority to review the decisions of the mayor or mayor pro tem.  The fact that the council may have exercised this authority without investigating the decisions, or merely rubber stamped these decisions, is not sufficient to support municipal liability for those decisions.  Plaintiff has failed to show that, as a matter of state law, Hammitt and Gonzales were the final policymakers for the Village of Cimarron with respect to their actions toward Plaintiff such that the Village can be held liable for those actions.  The Village is, therefore, entitled to summary judgment.

**CONCLUSION**

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment, or in the Alternative, for Qualified Immunity [Docket No. 43] is hereby GRANTED in part in that:

1.  The Village of Cimarron is entitled to summary judgment on the issue of municipal liability; and

2.  Defendants Hammitt and Gonzales are entitled to summary judgment on the issue of constructive discharge; and

23

3.  Defendant Gonzales is entitled to summary judgment for his alleged actions of yelling at Plaintiff, demanding audit results and other evidence, slandering Plaintiff in the community, and having family members slander Plaintiff in the community.  Additionally, Defendant Gonzales is entitled to summary judgment based on qualified immunity for these same actions and for allegedly accusing Plaintiff of stealing tornado relief funds, calling Plaintiff at home and yelling at her, reducing Plaintiff's job responsibilities and all other alleged retaliatory acts other than those specified below in the Court's partial denial of Defendants' Motion for Summary Judgment.

4.  Defendant Hammitt is entitled to summary judgment for his alleged actions of yelling at Plaintiff, demanding to see audit results and other evidence, for his actions at the May 2000 personnel meeting, for slandering Plaintiff in the community, having family members slander Plaintiff in the community, for the council meeting that never occurred, and for all other alleged retaliatory acts other than those specified below in the Court's partial denial of Defendants' Motion for Summary Judgment.  Additionally, Defendant Hammitt is entitled to summary judgment based on qualified immunity for these same actions.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment, or in the Alternative, for Qualified Immunity [Docket No. 43] is hereby DENIED in part in that:

1.  Defendant Gonzales is not entitled to qualified immunity or summary judgment for allegedly reprimanding Plaintiff in retaliation for her protected speech.

2.  Defendant Hammitt is not entitled to qualified immunity or summary judgment for allegedly reprimanding Plaintiff in retaliation for her protected speech or for sending her the July 2000 letter.

_____

UNITED STATES DISTRICT JUDGE